**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

JOEL WRIGHT
*Petitioner*,

v.

Case No. 3:25-cv-813 (OAW)

WARDEN FLOWERS, FCI DANBURY,
*Respondent*.

**ORDER GRANTING HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. § 2241**

> **Application of time credits toward prerelease custody or supervised release.--**Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.
>
> 18 U.S.C. §3632(d)(4)(C) (emphasis in original).

> "The Petitioner has now earned FSA time credits in an amount equal to the remainder of his sentence and is eligible to apply these credits as provided by 18 U.S.C. § 3632(d)(4)(C)."
>
> ECF No. 28 at 3, Response to Supplemental Reply.

> **Prerelease custody capacity.--**The Director of the Bureau of Prisons shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners.
>
> 18 U.S.C. § 3624(g)(11) (emphasis in original).

Self-represented petitioner Joel Wright has filed a Petition for Habeas Corpus seeking his release either to a residential re-entry center ("RRC") (commonly called a "halfway house") or to home confinement. Through the United States Attorney's Office,

Warden Flowers of FCI Danbury (where Petitioner is serving his sentence) has supplied detailed briefing describing ongoing efforts by the Federal Bureau of Prisons ("BOP") to place Mr. Wright into prerelease custody at either an RRC or through home confinement.

Throughout the pendency of this case, the parties have briefed the various obligations and impediments related to Petitioner's transition from prison back into the community, including discussions about the impact of his underlying conviction, his blindness, the Second Chance Act, the First Step Act, the Rehabilitation Act, and several other considerations. After a careful, thorough review of the record and all relevant law (including, in particular, the clear statutory mandates cited at the start of this ruling), and for the reasons which follow, the Petition for Writ of Habeas Corpus is **GRANTED.**

## I. BACKGROUND[1]

Mr. Wright is serving a federal prison sentence based on his conviction out of the Southern District of California in Case No. 3:16-cr-354-DMS, wherein he pleaded guilty to Count 1 of the Superseding Indictment, Attempted Enticement of a Minor, in violation of 18 U.S.C. § 2422(b).[2] *See* Case No. 3:16-cr-354-DMS at ECF No. 22. His plea was entered on April 13, 2016, *id.* at ECF No. 27, and was accepted on April 28, 2016, *id.* at ECF No. 28. Petitioner was sentenced to 188 months (15 years and 8 months) in prison, followed by life on supervised release, on July 1, 2016. *Id.* at ECF Nos. 78, 45. He

[1] Throughout this ruling, the court references pagination as generated by the court's CM/ECF system.

[2] At one point, Respondent correctly named this felony but listed its corresponding statute as "§ 2442(b)" instead of § 2422(b). *See* ECF No. 28 at 2. This is only significant in that federal prisoners are ineligible to receive time credits through the risk and needs assessment system established by 18 U.S.C. § 3632 if they are convicted of violating "Section 2442, relating to the recruitment or use of child soldiers." *See* 18 U.S.C. § 3632(d)(4)(D)(*l*). The court recognizes that § 2422 is not so listed, and finds that §2442 was referenced by Respondent in error. This is consistent with Respondent's concession that Petitioner is "eligible to apply" his FSA time credits. ECF No. 28 at 3. The court's review relates to this § 2422 crime.

previously moved for a reduction in sentence by compassionate release, but this motion was denied by the sentencing court, which noted that Mr. Wright already had been suffering from his physical disabilities at the time he had committed his "disturbing" crime, and which considered public protection and other § 3553(a) factors. *See United States v. Wright*, 46 F.4th 938 (9th Cir. 2022).

Petitioner also has a pending motion for sentence reduction (based on his glaucoma and blindness) in the United States District Court for the Southern District of California, where he is represented by the Federal Defenders of San Diego. Case No. 3:16-cr-354-DMS at ECF No. 83 (Aug. 4, 2026).

Here, he seeks release to an RRC or home confinement. The court already has found that Petitioner's ongoing detention has not been based solely on his disability, ECF No. 26, and has considered the additional months of briefing, detail, and developments.

## II. <u>DISCUSSION</u>

Petitioner brought this action under the Second Chance Act, 18 U.S.C. § 3624(c), *see* ECF No. 1, which statute directs BOP, "to the extent practicable," to ensure that federal prisoners have an opportunity to transition back into the community toward the end of their prison term through prerelease custody at an RRC or via home confinement. The United States Probation Office ("USPO" or "Probation") is instructed, "to the extent practicable," to assist prisoners during this transition. *See* 18 U.S.C. § 3624(c)(3). Probation also supervises people during their supervised release. *See* § 3624(e).

Respondent, and then Petitioner, went on to brief release opportunities and obligations pursuant to the First Step Act and other avenues of potential relief.

The court will offer additional detail where necessary to discuss the assessment of each claim.

### A. Second Chance Act

Respondent has explained BOP's efforts since December 2024 to place Petitioner in an **RRC** pursuant to the Second Chance Act. *See, e.g.,* ECF No. 28 at 6.

As in any attempt at prerelease community placement, BOP began by seeking a viable option within either the geographical area where Petitioner was sentenced or where he is likely to serve his eventual supervised release. *See id.* at 5–6. While Mr. Wright was sentenced in the Southern District of California, it was determined that he has no ties to that region. But since he listed his mother's Vermont residence as a proposed release location, BOP examined whether placement in or around Vermont might be possible. Unfortunately, there are no RRCs in Vermont. And when BOP reached out to an RRC contractor with facilities in Massachusetts, New Hampshire, and Rhode Island, none of them would accept Petitioner due to the "amount of daily assistance" he would need due to his blindness. *Id.* at 6. Specifically, because it was determined that Petitioner would need "assistance from inmate companions and since companions are not available in an RRC, [BOP] determined it was unsafe for Petitioner to reside in an RRC." ECF No. 21-1 at 2 ¶6. Nevertheless, Residential Reentry Management Branch (RRMB) Administrator Bianca Shoulders, who works at BOP's Central Office in Washington, D.C., represents in her Declaration that "RRMB is making every effort to contract with an RRC [in Vermont]." ECF No. 28-2 at 5 ¶ 19 (Jan. 22, 2026). The court has been given no plausible reason to dispute that assertion, nor to believe that RRMB's efforts have not been ongoing.

**Home confinement** proved similarly unworkable. For starters, Respondent explained that "the BOP typically employes a step-down approach where an inmate transfers from a secure facility to a Residential Reentry Center ("RRC") and then from an RRC to home confinement." ECF No. 21 at 2. And while some inmates occasionally are deemed appropriate for a transfer from prison directly to home confinement, that generally is available to prisoners with "**no** public safety factors." *Id.* (emphasis in original, though not in the document it cites). Here, BOP was unable to place Petitioner in an RRC. Further, the nature of Petitioner's conviction created a public safety factor which prevented a direct transition to home confinement. *See id.* And whereas Respondent appears to have occasionally referenced "§ 2442(b)" in error as the conviction of record, *see, e.g.,* ECF No. 28 at 2 (Jan. 22, 2026) and ECF No. 21 at 2 (Oct. 30, 2025), its attached Declaration of Residential Reentry Manager ("RRM") Patrick McFarland correctly cited "§ 2422(b)" as the relevant conviction which he represented resulted in Petitioner's "public safety factor of Sex Offender," *see* ECF No. 21-1 at 2 ¶11.

In addition to problems surrounding Petitioner's sex offender status, though, RRMB Administrator Shoulders also explained difficulties arranging the supervision which would be necessary for Petitioner to transition to home confinement. Specifically, that inmates on home confinement require supervision by either staff from a nearby RRC, or by USPO through the Federal Location Monitoring Program ("FLM") via an agreement between BOP and the Administrative Office of the United States Courts ("A.O."). *See* ECF No. 28-2 at 4 ¶12, 7 ¶33. However, the location of Petitioner's mother's home is not near an RRC with which BOP presently contracts, *id.* at 7 n.3, and so supervision of Petitioner during home confinement would have to be done by Probation, via the FLM.

*Id.* ¶33. Unfortunately, the FLM "generally denies inmates convicted of sex offenses," *id.* ¶34, and "typically does not oversee inmates for longer than one year," *id.* at 7–8 ¶34, whereas Petitioner's "projected release date [is] June 4, 2028," ECF No. 28 at 3, almost twice that length of time from now. For all of these reasons,[3] BOP exercised its discretion to deny Petitioner home confinement under the Second Chance Act.

Moreover, "to the extent practicable," BOP is instructed to ensure that prisoners can access a prerelease custody opportunity during the "final months" of their sentence, but "not to exceed 12 months." 18 U.S.C. § 3624(c)(1). Though Petitioner seeks expedited review of his claims, ECF No. 39, he still is not within the final year of his sentence and thus is not yet entitled to Second Chance Act relief, *see Torres v. Warden*, 2026 WL 143134 at *2 (2d Cir. 2026) (summary order) (finding the petitioner ineligible for Second Step Act relief because she was "not yet in the final twelve months of her sentence."), and he is only raising First Step Act claims now. *See* ECF No. 31 at 1.

Furthermore, BOP is instructed to ensure that prerelease custody placement complies with 18 U.S.C. § 3621(b). *See* 18 U.S.C. § 3624(c)(6). That federal statute lists considerations such as the nature and circumstances of the prisoner's offense, the resources of the prospective prerelease facility, the history and characteristics of the prisoner, and the articulation by the sentencing court in justifying the imposed sentence. *See* 18 U.S.C. § 3621(b). While "the RRM Office deemed Petitioner medically unsuitable for community placement under the Second Chance Act," ECF No. 17 at 2, and

[3] Shoulders also referenced an email from an attorney representing Petitioner who expressed that they were "concerned" about Petitioner's prerelease placement. ECF No. 28-2 at 7 ¶30. While this apparently was taken into consideration, *id.* ¶31, Shoulders does not appear to elaborate on counsel's concern, and Petitioner appears neither to dispute that this was his lawyer nor to inquire about the nature of their stated concern, but based on the context surrounding this comment, the court will presume that counsel expressed an interest in ensuring that Petitioner might be timely placed into prerelease custody.

determined that, "due to his medical needs and the resources available at the RRCs, Petitioner could not be safely placed in a Residential Reentry Center," *id.* at 9; *see also* ECF No. 17-3 at 3 ¶19, 16 (noting that Petitioner "was deemed medically unsuitable for placement in the RRC due to him being completely blind"), the nature of Petitioner's conviction and his criminal history proved problematic as to home confinement, as well, echoing some of the concerns raised by the sentencing court. Respondent has explained the difficulties in securing proper supervisory resources which otherwise might facilitate home confinement placement, and adequate supervision also would be consistent with the concerns expressed by the sentencing judge. As for the offense, "the [sentencing] court found that the facts of Wright's case were 'most deserving of punishment for punishment's sake alone, and most deserving of imposing a sentence that will protect society.'" *United States v. Wright*, 46 F.4th 938, 943 (9th Cir. 2022). As the crime related to Petitioner's history, the sentencing court "noted that Wright had 'continued to pursue this activity' despite his 'remorse and misgivings,' and notwithstanding his physical disabilities;" indeed, "Wright has struggled with disabilities throughout his life." *Id.* Public safety remained a primary concern when the sentencing judge also denied Petitioner compassionate release, finding that Wright "failed to show that he was 'not a danger to others or the community' given 'the disturbing nature of [his] crime' and the fact that he had committed it while he 'was already' suffering from the same disabilities." *Id.* at 944.[4]

[4] It was deemed an abuse of discretion for the sentencing judge to have "denied Wright's motion by holding that he failed to demonstrate that he is 'not a danger to others or [to] the community'," but this only was found to have amounted to harmless error in that the sentencing court also provided § 3553(a) factors which it found weighed "squarely against" granting compassionate release. *See Wright*, 46 F.4th at 946 (9th Cir. 2022).

To the extent Petitioner has raised claims related to the Second Chance Act, *see* ECF Nos. 1, 22, 23, and 29, the court cannot a sufficient basis pursuant to that Act to grant the requested habeas relief, particularly given the individualized, discretionary review explained by Respondent, together with the fact that there is more than one year remaining on the sentence Petitioner is serving.

However, Petitioner also seeks "community placement" at either an RRC or into home confinement pursuant to the First Step Act, based on time credits he has earned through prison programming. *See* ECF No. 29.

**B. <u>First Step Act</u>**

Eight months into this matter, and after the court had retained jurisdiction to consider other bases "which might ripen for the court's adjudication," ECF No. 26, Petitioner filed a motion asking to grant his habeas pursuant to the First Step Act, in that by then, Petitioner had "earned First Step Act ("FSA") time credits equal to the amount of time remaining on his sentence," ECF No. 29 (Jan. 27, 2026), as required by 18 U.S.C. §§ 3632(d)(4)(C) and 3624(g)(1)(A).

Petitioner reached his "FSA Conditional Placement Date" on January 6, 2026, meaning that this was the point at which he had earned time credits equal to the remainder of his sentence. *See* ECF No. 28-2 at 8 ¶35.

Still being the case that there was no **RRC** in Vermont at such time, BOP also examined possible placement at contract RRCs in Maine and Connecticut, but each denied Petitioner because they were unable to meet his medical needs. *See* ECF No. 28 at 8. The nature of Petitioner's conviction and, again (though not only) his medical needs, also prevented his placement in his district of conviction, the Southern District of

California. *Id.* In fact, the RRMB "is unaware of any other RRC in the country that can provide the type of medical assistance Petitioner needs." *Id.*

Despite that fact, there is a legislative mandate that the "Director of the Bureau of Prisons shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners." 18 U.S.C. § 3624(g)(11). It is unclear whether this "sufficient capacity" language is intended to mandate RRC capacity to accommodate prisoner disabilities, though other legislative protections from disability discrimination might prohibit the disparate release of eligible prisoners who have (and who do not have) disabilities. Regardless, the "sufficient capacity" phrase ends by requiring the ability to accommodate "all ***eligible*** prisoners." 18 U.S.C. § 3624(g)(11) (emphasis added). And, a prisoner is deemed "eligible" under subsection (g)(1) if: they have earned time credits equal to the remainder of their prison term; and their assessment shows "a demonstrated recidivism risk reduction" or they have "maintained a minimum or low recidivism risk" in prison; and, for prisoners being placed in prerelease custody, they have: (I) been determined via their last 2 reassessments to be a "minimum or low risk to recidivate," or (II) received approval by the warden that the prisoner: (a) is not a danger to society, (b) has made a "good faith effort to lower their recidivism risk" through programming, and (c) "is unlikely to recidivate;" or, for those transitioning to supervised release, they have been deemed by their last assessment "a minimum or low risk to recidivate." Here, Respondent has conceded that Petitioner "is eligible [pursuant to] 18 U.S.C. § 3632(d)(4)(C)," ECF No. 28 at 3, which statute specifies that it is referencing the very same eligibility "as determined under section 3624(g)." *See* 18 U.S.C. § 3632(d)(4)(C).

Petitioner argues that a "public safety factor is not part of the First Step Act," ECF No. 29 at 1, and while some might argue that to consider the risk of recidivism as to someone convicted of Attempted Enticement of a Minor necessarily involves the consideration of public safety risks, Respondent concedes FSA eligibility.

Setting that aside, though, Petitioner then argues that there is a "voluminous [number of] individuals" whom he claims have been "released . . . from the FCI Danbury facility [where Petitioner is serving his prison sentence] to home confinement despite their sex offender public safety factor." *Id.* Rather than citing any examples of the same, Petitioner begins by referencing the case of Ghislaine Maxwell, *id.* at 2, who was convicted of child sex trafficking and was associated with Jeffrey Epstein,[5] but Mr. Wright does not develop the relevance of that case other than to perhaps suggest that BOP sometimes overlooks public safety concerns related to certain high-profile sex offenders. While Petitioner is hardly alone in questioning the reasonableness of BOP's movements of Ms. Maxwell, *see, e.g.,* U.S. Senate Committee on the Judiciary, "Durbin, Whitehouse Press For Public Commitments From Deputy Attorney General After Meeting With Ghislaine Maxwell," available at: https://www.judiciary.senate.gov/press/dem/releases/durbin-whitehouse-press-for-public-commitments-from-deputy-attorney-general-after-meeting-with-ghislaine-maxwell (last visited Sept. 9, 2026); Bernd Debusmann, Jr., "Ghislaine Maxwell moved to women's prison in Texas," BBC News, available at: https://www.bbc.com/news/articles/czd049y2qymo (last visited Sept. 9, 2026); Eric Tucker, "Ghislaine Maxwell transferred to minimum-security prison camp in Texas,"

[5] *See* "Ghislaine Maxwell Sentenced To 20 Years In Prison For Conspiring With Jeffrey Epstein To Sexually Abuse Minors," United States Attorney's Office, Southern District of New York, available at: https://www.justice.gov/usao-sdny/pr/ghislaine-maxwell-sentenced-20-years-prison-conspiring-jeffrey-epstein-sexually-abuse (last visited Sept. 9, 2026).

Associated Press, available at: https://www.pbs.org/newshour/nation/ghislaine-maxwell-transferred-to-minimum-security-prison-camp-in-texas (last visited Sept. 9, 2026); Jacob Wendler, "Deputy AG Todd Blanche defends moving Ghislaine Maxwell to minimum-security prison," Politico, available at: https://www.politico.com/news/2025/12/21/todd-blanche-defends-moving-ghislaine-maxwell-00702240 (last visited Sept. 9, 2026), it appears that Ms. Maxwell remains in a BOP prison and that she has not been released to an RRC or to home confinement under the First Step Act or any other authority, *see* BOP Inmate Locator (Ghislaine Maxwell, Register Number: 02879-509), available at: https://www.bop.gov/inmateloc/ (last visited Sept. 9, 2026) (showing current detention at a "minimum security federal prison camp"). Therefore, the *Maxwell* case seems easily distinguishable from the case at bar.

Petitioner also references the case of Donald Lamoureaux, whom Petitioner reports was released into an RRC despite having been "convicted of the same offense" as Petitioner, thus suggesting that it is only Petitioner's disability which is causing BOP to treat him differently than people without a disability. *See* ECF No. 29 at 2 (noting, "The only difference between Mr. Lamoureaux and . . . Petitioner is that . . . Petitioner is blind."). The undersigned was able to learn by reviewing public court records that Mr. Lamoureaux was convicted of Enticing a Minor in violation of 18 U.S.C. § 2422(b) at the United States District Court for the Western District of Arkansas, and that such court sentenced him to 180 months in prison, followed by 10 years of supervised release. *See* Case No. 2:15-cr-20003-JTS-1 (W.D.Ark.). In that case, it appears BOP determined Mr. Lamoureaux should be placed in an RRC rather than being released to home confinement because of the nature of his conviction (to ensure that he would not have contact with minors or

prohibited computer access), and while his conviction prevented RRC placement in Arkansas (where he had been sentenced), BOP was able to place him at an RRC in Kansas. Application of FSA credits moved up his projected release date from 11/18/2027 to 11/18/2026, and it appears Lamoureaux was released to a Kansas RRC much earlier than that, on or about January 30, 2025. *See* Case No. 3:24-cv-1974-KAD at ECF No. 15 (D.Conn. Feb. 18, 2025). However, Petitioner does not assert what ties Mr. Wright might have to that region, nor why the Kansas RRC should be deemed a comparable and available option for him, too, nor even whether the Kansas RRC can accommodate his needs relative to his disability. He also fails to assert whether there is “sufficient capacity” remaining in that Kansas RRC to accommodate him (with or without a disability), and he does not mention that Lamoureaux “could not be housed at the RRC in Arkansas because the RRC is located within a certain distance of a school, and state law prohibited convicted sex offenders from living in such proximity.” *Id.* at ECF No. 11 (D.Conn. Jan. 10, 2025).

All that being the case, though, the plan for Petitioner’s eventual release from custody presently is unclear, albeit beyond the scope of the present habeas petition. Perhaps it will involve **home confinement** with supervision by Probation via the FLM Program, sometime on or before June 2027 (which would be one year before Petitioner’s “projected release date of June 4, 2028,” *see* ECF No. 28 at 3). Whereas Probation already declined supervision of Petitioner on home confinement for reasons other than his disability, perhaps USPO would be willing to overlook his conviction and monitor him for a period not to exceed one year (so that BOP could comply with the FSA).

Presently, though, the court is compelled to grant the habeas relief sought, based on the clear and mandatory language provided by Congress as to prerelease custody.

Statutory law holds, "The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g) [the risk and needs assessment system], into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). And, "The Director of the Bureau of Prisons shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners." 18 U.S.C. § 3624(g)(11). Read together, the mandate from the legislature is clear, and the court is bound to interpret it that way.

Petitioner indisputably has earned ***hundreds*** of FSA time credits which have not been applied – some 895 as of January 20, 2026. *See* ECF No. 28-2 at 9 ¶ 44. Understandably, he hopes that the law can hold BOP to its legislative mandate to "ensure there is sufficient prerelease custody capacity" to accommodate his release, as an "eligible" prisoner. *See* 18 U.S.C. § 3624 (g)(11). But the United States Court of Appeals for the Second Circuit recently has held that 18 U.S.C. "Section 3632(d)(4)(C) does not allow earned-time credits to be used to reduce a prisoner's term of supervised release." *Rivera-Perez v. Stover*, 171 F.4th 196 (2d Cir. 2026). In so finding, the Second Circuit described over 400 credits a petitioner had earned but had been unable to apply to his prerelease custody, because "there was no bedspace available in an RRC." *Id.* at 200. Eventually, that petitioner was transitioned to an RRC, thus rendering moot his petition, but the district court in that case reduced the length of that petitioner's supervised release as a means of accounting for the credits he had earned but had been unable to apply. *Id.* In concluding that this was not authorized by the relevant statute, the Second Circuit vacated judgment and remanded the case, but it did not also comment that BOP was failing to honor its duty to ensure that there was sufficient RRC space to accommodate the petitioner; instead, it reasoned that "excess credits are by no means wasted.

Individuals who complete recidivism reduction programming have presumably obtained useful benefits: vocational training, substance abuse treatment, academic coursework, training in life skills, etc." *Id.* at 209. To that end, criminal defendants in this district often request permission to attend Support Court prior to sentencing, with ***no*** promise of a reduced sentence (whereas their participation *after* serving a term of imprisonment can permit them to earn a reduction in their term of supervised release), and in fact such pre-sentencing participation often serves to significantly delay a term of imprisonment which might be inevitable (as to crimes requiring mandatory imprisonment), or at least eventual, by the time of sentencing.

So, while Mr. Wright argues that, if BOP were permitted to continue its failure to timely apply earned FSA credits without consequence, "inmates [would] not be incentivized to participate in rehabilitation programs, which [would] not benefit society as a whole," *see* ECF No. 29 at 3, this court might not entirely agree. Sure, "prisoners can receive phone or video conferencing privileges, additional time for visitation at the prison, transfer to a BOP facility closer to the prisoner's release residence, increased commissary spending limits and product offerings, extended opportunities to access email, or consideration of transfer to preferred housing units" through their participation in activities and programming, *see Rivera-Perez*, 171 F.4th at 209 (2d Cir. 2026), but at its core, "incarceration is more onerous than being in a private home with relatives," *Wright*, 46 F.4th at 952 n.13 (9th Cir. 2022), even when on home confinement or supervised release. Part of the purpose of prison is that it *is* punishment, in itself. However, that punishment must be "sufficient, but no greater than is necessary." *See* 18 U.S.C. § 3553(a).

Petitioner typed an errant period within a sentence at ECF No. 29, but it was a poignant one, because it is sad indeed if "BOP is allowed to arbitrarily withhold those earned time credits." Period. *See* ECF No. 29 at 3. "FSA time credits . . . reduce a prisoner's time in incarceration," *Rivera-Perez*, 171 F.4th at 210 (2d Cir. 2026), but only when that promise is honored.

Realistically, BOP and Probation have limited resources with which to ensure public safety, prisoner safety, and adherence to statutory and judicial demands. But to a prisoner such as Mr. Wright, he might not feel like "a college student who completes more coursework than is necessary to graduate," *see id.* at 209, when he has earned hundreds of time credits but learns that he must sit in federal prison for several additional months because those credits cannot be applied toward his early release.

The court recognizes it must be frustrating to a prisoner if BOP is unable to ensure sufficient prerelease custody capacity in the way that it ensures there are enough prison cells to house those whom our district courts sentence to a term of imprisonment.

At the same time, the court understands that government agencies might have to operate on a thin budget, as might be true for many private sector companies these days. Resources might be limited, especially as to someone with Petitioner's needs and risks.

However, Congress enacted clear statutes which create a mandate that BOP must transfer eligible prisoners into prerelease custody or supervised release, and to ensure that there is sufficient prerelease custody capacity to do so. And the court must uphold the promise of those legislative mandates, even as to Mr. Wright, who was sentenced to 15 years and 8 months in prison, followed by life on supervised release for his Attempted Enticement of a Minor, and who is disabled. Thus, the petition must be **GRANTED.**

Given the particular facts and circumstances of this case as detailed throughout this ruling, the court understands (and hopes Petitioner does, too) that Petitioner could very well be transferred to a distant and/or remote RRC in: Kansas, *see Lamoureaux,* Case No. 3:24-cv-1974-KAD at ECF No. 15; or Texas, *see Mateo v. Warden*, Case No. 3:25-cv-814-VAB at ECF No. 22; or North Carolina, *see Rivera-Perez*, Case No. 3:23-cv-1348-SRU at 22; or Alaska, for that matter. It is unclear whether Mr. Wright understands and fully accepts that potential fate in pursuing the instant habeas relief. To account for that practicality, and to afford reasonable time to effectuate a safe, reasonable placement, the court hereby takes the following action.

## III. CONCLUSION

The Petition for Writ of Habeas Corpus, ECF No. 1, is **GRANTED.**

The motion for Enlargement, ECF No. 27, is **DENIED as moot.** The arguments raised by Respondent at ECF No. 28, and the concerns listed there and within this ruling remain valid, but as habeas relief has been granted, the court will permit time for Respondent to comply with this ruling and with the statutory authorities cited by the court, while permitting Petitioner time to withdraw his petition if he would prefer to remain in prison than to be transferred to the region designated by Respondent.

The motion to consider at ECF No. 29 is **GRANTED,** insofar as the court has granted the petition on First Step Act grounds, with the cautions previously issued. Petitioner did not there seek an order of release to a particular RRC, which the court could not issue and presumes to suggest that Petitioner is fully aware that BOP could designate him to an RRC anywhere in the country, despite his ties near the District of Vermont.

ECF No. 32 is **DENIED as moot.** The court did not find a hearing necessary, particularly in light of its review of the relevant statutes, and of *Rivera-Perez v. Stover*, 171 F.4th 196 (2d Cir. 2026).

The motion for extension of time, ECF No. 30, is **GRANTED;** ECF No. 31 was accepted as timely and was considered in nevertheless denying enlargement, which itself took into account the various competing concerns addressed throughout this ruling.

The court also considered Respondent's sur-reply at ECF No. 36, and so the included motion for permission to file it, itself is **GRANTED.** For clarity of the record, the court notes that it considered ECF No. 37, as well.

And while at ECF No. 38, Petitioner reported that the FCI Danbury copy machine was out of toner and that it would not be replaced, such that it would be "impossible for all inmates to timely file court documents and . . . may completely hinder . . . Petitioner's ability to prosecute this case," he filed a motion to expedite one month later, ECF No. 39, without any further mention of the inoperable copy machine or his inability to litigate.

Finally, while the court apologizes for its delay in ruling on these motions, and ultimately on the petition itself, having carefully considered the relevant statutory language along with the practical impact of habeas petition rulings by the district courts within the Second Circuit, and appellate rulings pertaining thereto, the motion to expedite at ECF No. 33, the motion for status update at ECF No. 34, and the second motion to expedite at ECF No. 39, hereby are **DENIED as moot.**

Accordingly, Respondent is **ORDERED** to determine a plan to transfer Mr. Wright into prerelease custody or supervised release, and to docket, **on or before Friday, October 9, 2026,** the location to which Petitioner will be designated by BOP.

Thereafter, Petitioner must docket, **on or before Friday, October 23, 2026,** either a withdrawal of his petition (in which case this matter would be closed by the court), or confirmation that Petitioner would like to proceed with his anticipated designation.

Again, Respondent is to indicate via the docket (by October 9) its ***plan*** to effectuate compliance with this order and the statutory law cited herein, leaving Petitioner until October 23 to decide whether that plan will take effect or he will withdraw his petition (upon which the court will close this case). Regardless, Petitioner is advised that BOP might take action on its own to comply with the law, whether or not the petition is withdrawn. However, the court is confident that BOP's designation determination will not be based on retribution in any way, given the efforts already made (and which are ongoing) to responsibly place Petitioner in a safe and reasonable setting in accordance with all applicable policy and law.

**IT IS SO ORDERED** in Hartford, Connecticut, this 10th day of September, 2026.

*/s/*
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE